ELECTRONICALLY
FILED
Apr 12 2022
U.S. DISTRICT COURT
Northern District of WV

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

| | |
|---|---|
| RACHEL SILBAUGH, ROBIN STRIPLING AND MICHAEL STRIPLING individually and on behalf of all others similarly situated<br><br>**Plaintiff,**<br><br>v.<br><br>**MONONGALIA HEALTH SYSTEM, INC., MONONGALIA COUNTY GENERAL HOSPITAL COMPANY, STONEWALL JACKSON MEMORIAL HOSPITAL COMPANY, AND PRESTON MEMORIAL CORPORATION,**<br><br>**Defendants.** | **CIVIL ACTION – CLASS ACTION JURY TRIAL DEMANDED**<br><br>**No.**   **1:22-CV-33 (Kleeh)** |

Plaintiffs Rachel Silbaugh, Robin Stripling, and Michael Stripling ("Plaintiffs"), individually and on behalf of the Class defined below of similarly situated persons, brings this Class Action Complaint and alleges the following against Monongalia Health System, Inc. and its affiliated hospitals, Monongalia County General Hospital Conpany, Stonewall Jackson Memorial Hospital Company and Preston Memorial Hospital Corporation (collectively, "Mon Health" or "Defendants"), based upon personal knowledge with respect to Plaintiffsand on information and belief derived from, among other things, investigation of counsel and review of public documents as to all other matters:

## NATURE OF THE ACTION

1.      Plaintiffs bring this class action against Mon Health for Mon Health's failure to properly secure and safeguard protected health information as defined by the Health Insurance Portability and Accountability Act ("HIPAA"), medical information, and other personally identifiable information, including without limitation names, addresses, dates of birth, Social

Security numbers, Medicare Health Insurance Claim Numbers, patient account numbers, health insurance plan member ID numbers, medical record numbers, dates of service, provider names, claims information, medical and clinical treatment information, and patient status information (collectively, "PHI"), for failing to comply with industry standards to protect information systems that contain that PHI, and for failing to provide timely, accurate, and adequate notice to Plaintiffs and other Class Members that their PHI had been compromised. Plaintiffs seek, among other things, orders requiring Mon Health to fully and accurately disclose the nature of the information that has been compromised and to adopt reasonably sufficient security practices and safeguards to prevent incidents like the disclosure in the future.

2.      Mon Health is the "parent" company of Mon Health Medical Center (formerly "Monongalia County General Hospital Company), Mon Health Preston Memorial Hospital and Mon Health Stonewall Jackson Memorial Hospital.[1] Mon Health provides personalized medical care and service to North Central West Virginia, southwestern Pennsylvania, and the surrounding region.[2]

3.      On or about February 28, 2022, Mon Health announced a security incident that occurred in December 2021, involving patient PHI. (the "Data Breach"). The security incident was wide-reaching and compromised  the PHI of at least 492,861 individuals, according to the submission Mon Health made to the U.S. Secretary of Health and Human Services at the Office for Civil Rights ("OCR").[3]

---

[1] *See* https://www.monhealth.com/main/about-mon-health-system (last accessed Apr. 5, 2022).
[2] *Id.*
[3] Department of Health and Human Services, Office for Civil Rights, Breach Portal: Notice to the Secretary of HHS Breach of Unsecured Protected Health Information, https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last accessed April 5, 2022).

4.     Mon Health determined that unauthorized parties accessed its IT network between December 8, 2021 and December 19, 2021. Mon Health first leaned of this incident on December 19, 2021, when it was alerted to unusual activity in its IT network which disrupted the operations of some of Mon Health's IT systems. On December 30, 2021, Mon Health determined that the Data Breach resulted in "unauthorized access to information pertaining to Mon Health patients, providers, employees, and contractors."[4]

5.     As a result of Mon Health's failure to implement and follow basic security procedures, Plaintiffs' and Class Members' PHI is now in the hands of criminals. Plaintiffs and Class Members now and will forever face a substantial increased risk of identity theft. Consequently, Plaintiffs and Class Members have had to spend, and will continue to spend, significant time and money in the future to protect themselves due to Mon Health's failures.

6.     Additionally, as a result of Mon Health's failure to follow contractually-agreed upon, federally-prescribed, industry standard security procedures, Plaintiffs and Class Members received only a diminished value of the services Mon Health was to provide. Mon Health expressly represented that it would maintain the confidentiality of Plaintiffs and Class Members' PHI obtained throughout the course of medical services.

7.     Accordingly, Plaintiffs, individually and on behalf of all others similarly situated, alleges claims for negligence, breach of contract, breach of implied contract, and breach of confidence.

---

[4] Ex. 1, Mon Health Notice of Data Security Incident, also available at https://www.monhealth.com/Uploads/Public/Documents/Mon%20Health%20-%20Notice%20of%20Data%20Security%20Incident.pdf (last accessed Apr. 5, 2022).

## PARTIES

8.      Plaintiff Rachel Silbaugh is a citizen and resident of Pennsylvania. At all times relevant to this Complaint, Plaintiff was a patient of Mon Health. Plaintiff's PHI was disclosed without authorization to an unknown third party as a result of the Data Breach.

9.      Plaintiff Robin Stripling is a citizen and resident of West Virginia. At all times relevant to this Complaint, Plaintiff was a patient of Mon Health. Plaintiff's PHI was disclosed without authorization to an unknown third party as a result of the Data Breach.

10.     Plaintiff Michael Stripling is a citizen and resident of West Virginia. At all times relevant to this Complaint, Plaintiff was a patient of Mon Health. Plaintiff's PHI was disclosed without authorization to an unknown third party as a result of the Data Breach.

11.     Mon Health is the "parent" company of Mon Health Medical Center, Mon Health Preston Memorial Hospital, and Mon Health Stonewall Jackson Memorial Hospital.[5]

12.     Mon Health Medical Center (formerly Monongalia General Hospital) is the flagship member of Mon Health and is a 164-bed hospital in West Virginia, employing more than 250 physicians.[6]

13.     Mon Health Preston Memorial Hosptial joined Mon Health in February 2014 and is a 25-bed critical access, acute care hospital located in Kingwood, West Virginia.[7]

14.     Mon Health Stonewall Jackson Memorial Hospital joined Mon Health in October 2017 and is a 70-bed general medical and surgical hospital in Weston,West Virginia.[8]

15.     Mon Health's principal address is 1200 J.D. Anderson Drive, Morgantown, West

---

[5] *See* https://www.monhealth.com/main/about-mon-health-system (last accessed April 5, 2022).
[6] *Id.*
[7] *Id.*
[8] *Id.*

Virginia 26505.

16.    Mon Health cares for patients in North Central West Virginia, southwestern Pennstlvania, and the surrounding region through a network of hospitals, primary and specialty care practices, and outpatient services. Due to the nature of these services, Mon Health acquires and electronically stores patient PHI.

## JURISDICTION AND VENUE

17.    This Court has subject matter and diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount of controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one Class Member is a citizen of a state different from Defendants to establish minimal diversity, as Plaintiff is a citizen of a state different from Mon Health.

18.    This Court has personal jurisdiction over Mon Health because Mon Health is headquartered in Morgantown, West Virginia, and conducts substantial business in this District.

19.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in, was directed to, and/or emanated from this District, Defendants are based in this District, Defendants maintain patients' PHI in this County, and has caused harm to Plaintiffs and Class Members residing in this District.

## FACTUAL BACKGROUND

### A. Mon Health's Business

20.     Mon Health was formed in 1982 to aid in strategic planning and to manage all of its affiliated entities.[9]

21.     Mon Health's entities consist of Mon Health Medical Center, Mon Health, Preston Memorial Hospital, Mon Health Stonewall Jackson Memorial Hospital, Mon Health Equipment & Supplies, and Mon Health The Village at Heritage Point. Mon Health is also affiliated with HealthWorks Rehab and Fitness, HeathSouth MountainView Rehabilitation Hospital, Amedisys, and the Surgical Eye Center of Morgantown.[10]

22.     As a healthcare provider, Mon Health is required to ensure that the private, personal information it collects and stores is not disclosed or disseminated to unauthorized third parties without the patients' express written consent.

23.     Indeed, Mon Health acknowledges that patients "have a right to expect certain things about the care they will receive at Mon Health. Included among these rights [is] the following . . .  the right to have all records pertaining to his or her medical care treated as confidential except as otherwise provided by law or third-party contractual arrangements."[11] This includes the PHI that was accessed in the Data Breach without authorization.

24.     As further detailed below, Mon Health also promised Plaintiffs and Class Members that it would protect their PHI through its Notice of Privacy Practices.

### B. The Data Breach

---

[9] See https://www.monhealth.com/main/about-mon-health-system (last accessed April 5, 2022).
[10] *Id.*
[11] *See* https://www.monhealth.com/main/patient-rights-and-responsibilities (last accessed April 5, 2022).

25.     On December 18, 2021, Mon Health identified unusual activity in its IT network which disrupted the operations of some of Mon Health's IT systems.[12]

26.     After engaging law enforcement, a third-party forensic firm, and launching an investigation, Mon Health determined that a data security incident resulted in unauthorized access to information pertaining to Mon Health patients, providers, employees, and contractors.[13]

27.     The investigation concluded that unauthorized parties accessed its IT network between December 8, 2021 and December 19, 2021. In its IT network, the unauthorized third parties had access to sensitive patient PHI including: names, addresses, dates of birth, Social Security numbers, Medicare Health Insurance Claim Numbers, patient account numbers, health insurance plan member ID numbers, medical record numbers, dates of service, provider names, claims information, medical and clinical treatment information and patient status.[14]

28.     Mon Health has not revealed additional details regarding the scope of access, leaving open the possibility that PHI was not only accessed, but copied and/or removed from its IT network.

29.     On February 28, 2022, nearly two months after its investigation concluded that Plaintiffs and Class Member PHI had been accessed without authorization, Mon Health began mailing letters to those whose information was identified as compromised.

30.     The Notice Letters Plaintiffs and Class Members received were untimely and woefully deficient, failing to provide basic details concerning the Data Breach, including, but not limited to, why sensitive PHI was stored on systems without adequate security, the deficiencies in

---

[12] *See* Ex. 1
[13] *Id.*
[14] *Id.*

the security systems that permitted unauthorized access, whether the stolen data was encrypted or otherwise protected, and whether Mon Health knows if the data has not been further disseminated.

31.     Even worse, Mon Health warns Plaintiffs and Class Members to remain vigilant by reviewing financial account statements for unauthrized activity, while offering no credit monitoring or identity theft protection services. Curiously, Mon Health does not list payment card data as part of the sensitive information accessed by the unauthorized third parties.[15]

32.     Taking no responsibility for its actions and inactions, Mon Health places the burden of the Data Breach on Plaintiffs and Class Members, recommending that they review the statements they receive from their healthcare providers and health insurance plans for fraudulent activity.[16]

33.     To date, Mon Health has not yet disclosed full details of the Data Breach. Without such disclosure, questions remain as to the full extent of the Data Breach,  the actual data accessed and compromised, and what measures, if any, Mon Health has taken to secure the PHI still in its possession. Through this litigation, Plaintiffs seek to determine the scope of the Data Breach and the information involved, obtain relief that redresses Plaintiffs' harms, and ensure Mon Health has proper measures in place to prevent another breach from occurring in the future.

### C.  Mon Health's Privacy Practices

34.     Mon Health pledges that it takes patient privacy very seriously. Mon Health makes numerous promises to its patients that it will maintain the security and privacy of their PHI.

---

[15] *Id.*
[16] *Id*.

35.    Mon Health acknowledges in its Notice of Privacy Practices that  it is "required by maintain the privacy and security of [patient] protected health information."[17]

36.    Mon Health discloses certain situations and circumstances in which it uses and discloses PHI, none of which describe the facts involved in the Data Breach.[18]

37.    Mon Health created these policies, representations, and requirements, and publicly advertises them on its website as a means of increasing the value of its relationships with patients, thus allowing it to charge consumers higher rates under the guise of enhanced security and information security practices.

38.    Upon information and belief, Mon Health's Notice of Privacy Practices is given to patients as they are admitted to the hospital or visit outpatient areas for services and treatment. Mon Health makes a direct effort to inform patients of its promises regarding patient privacy.

### D. The Healthcare Sector is Particularly Suseptible to Data Breaches

39.    Mon Health was on notice that companies in the healthcare industry are susceptible targets for data breaches.

40.    Mon Health was also on notice that the FBI has been concerned about data security in the healthcare industry. In August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies within the healthcare industry that hackers were targeting them. The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related

---

[17]*See* https://www.monhealth.com/Uploads/Public/Documents/Mon%20Health%20System%20Notice%20of%20Privacy%20Practices%20rev10-2020.pdf (last accessed April 5, 2022).

[18] *Id.*

systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PHI)."[19]

41.    The number of U.S. data breaches surpassed 1,000 in 2016, a record high and a forty percent increase in the number of data breaches from the previous year.[20] In 2017, a new record high of 1,579 breaches were reported representing a 44.7 percent increase.[21] That trend continues.

42.    The healthcare sector reported the second largest number of breaches among all measured sectors in 2018, with the highest rate of exposure per breach.[22] Indeed, when compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[23] Almost 50 percent of the victims lost their healthcare coverage as a result of the incident, while nearly 30

---

[19] Jim Finkle, *FBI Warns Healthcare Firms that they are Targeted by Hackers*, Reuters (Aug. 2014), *available at*: https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warns-healthcare-firms-they-are-targeted-by-hackers-idUSKBN0GK24U20140820 (last accessed Apr. 5, 2022).

[20] Identity Theft Resource Center, *Data Breaches Increase 40 Percent in 2016, Finds New Report From Identity Theft Resource Center and CyberScout* (Jan. 19, 2017), *available at:* https://www.idtheftcenter.org/post/data-breaches-up-nearly-45-percent-according-to-annual-review-by-identity-theft-resource-center-and-cyberscout/(last accessed Apr. 5, 2022).

[21] Identity Theft Resource Center, *2017 Annual Data Breach Year-End Review, available at:* https://www.idtheftcenter.org/2017-data-breaches/ (last accessed Apr. 5, 2022).

[22] Identity Theft Resource Center, *2018 End -of-Year Data Breach Report, available at*: https://www.idtheftcenter.org/2018-data-breaches/ (last accessed Apr. 5, 2022).

[23] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010), *available at:* https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/ (last accessed Apr. 5, 2022).

percent said their insurance premiums went up after the event. Forty percent of the customers were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy as a whole.[24]

43.     Healthcare related breaches have continued to rapidly increase because electronic patient data is seen as a valuable asset. According to the 2019 HIMSS Cybersecurity Survey, 82 percent of participating hospital information security leaders reported having a significant security incident in the last 12 months, with a majority of these known incidents being caused by "bad actors" such as cybercriminals.[25] "Hospitals have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From social security and insurance policies, to next of kin and credit cards, no other organization, including credit bureaus, have so much monetizable information stored in their data centers."[26]

44.     The American Medical Association ("AMA") has also warned healthcare companies about the importance of protecting their patients' confidential information:

> Cybersecurity is not just a technical issue; it's a patient safety issue. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that cyberattacks not only threaten the privacy and security of patients' health and financial information, but also patient access to care.[27]

---

[24] *Id.*

[25] *2019 HIMSS Cybersecurity Survey, available at*: https://www.himss.org/2019-himss-cybersecurity-survey (last accessed Apr. 19, 2021).

[26] Inside Digital Health, *How to Safeguard Hospital Data from Email Spoofing Attacks*, April 4, 2019, *available at*: https://www.idigitalhealth.com/news/how-to-safeguard-hospital-data-from-email-spoofing-attacks (last accessed Apr. 5, 2022).

[27] Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, Am. Med. Ass'n        (Oct.        4,        2019),        https://www.ama-assn.org/practice-

45. As a major healthcare provider, Mon Health knew, or should have known, the Importance of safeguarding the patients' PHI entrusted to it and of the foreseeable consequences if that data was disclosed. This includes the significant costs that would be imposed on Mon Health's patients as a result of a breach. Mon Health failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

### E. Mon Health Obtains, Collects, and Stores Plaintiffs' and Class Members' PHI

46.    Mon Health obtains, collects, and stores a massive amount of protected health information and personally identifiable data.

47.    As a condition of engaging in health services, Mon Health requires that patients entrust it with highly confidential PHI.

48.    By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' PHI, Mon Health assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs and Class Members' PHI from disclosure.

49.    Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their PHI and they reasonably relied on Mon Health to keep this information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

### F. Securing PII and Preventing Breaches

50.    Mon Health could have prevented this Data Breach by properly securing and

---

management/sustainability/cybersecurity-ransomware-attacks-shut-down-clinics-hospitals    (last visited Apr. 5, 2022).

Encrypting the files and file servers containing the PII of Plaintiffs and Class Members. Alternatively, Mon Health could have destroyed the data, especially outdated information.

51.     Defendants' negligence in safeguarding the PII of Plaintiffs and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

52.     Despite the prevalence of public announcements of data breaches and data security compromises, Defendants failed to take appropriate steps to protect the PHI of Plaintiffs and Class Members from being compromised.

53.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud Committed or attempted using the identifying information of another person without authority."[28] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[29]

54.     The ramifications of Defendants' failures to keep secure the PHI of Plaintiffs and Class Members are long lasting and severe. Once PII is stolen, particularly Social Security numbers, fraudulent use of that information and damage to victims may continue for years.

### G.  The Value of PHI and the Effects of Unauthorized Disclosure

55.     Mon Health was well aware that the protected health information and personally identifiable information it collects is highly sensitive and of significant value to those who would use it for wrongful purposes.

---

[28] 17 C.F.R. § 248.201 (2013).
[29] *Id.*

56.     The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[30] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[31]

57.     Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

58.     A dishonest person who has your Social Security number  can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[32]

---

[30] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct.16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web- how-much-it-costs/ (last visited Jan. 13, 2022).
[31] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017,        *available at*: https://www.experian.com/blogs/ask- experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark- web/ (last visited Jan. 13, 2022).
[32] *Identity Theft and Your Social Security Number*, Social Security Administration, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Jan. 13, 2022).

59.    What is more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

60.    Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[33]

61.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—name, Social Security number, medical records, and potentially date of birth.

62.    This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[34]

---

[33] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthems-hackers-has-millionsworrying-about-identity-theft (last visited Jan. 13, 2022).

[34] Time Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*:

63.    Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

64.    The PII of Plaintiffs and Class Members was taken by hackers to engage in identity theft and/or to sell to other criminals who will purchase the PII for that purpose.  The fraudulent activity resulting from the Data Breach may not come to light for years.

65.    There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[35]

66.    At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding the PHI of Plaintiffs and Class Members, including Social Security numbers and medical records, and of the foreseeable consequences that would occur if Defendants' data security system was breached, including, specifically, the  significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

67.    Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use  of their PHI.

---

https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited Jan. 13, 2022).

[35] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* https://www.gao.gov/assets/gao-07-737.pdf (last visited Jan. 13, 2022).

68.     Defendants were, or should have been, fully aware of the unique type and the significant volume of data on Defendants' file servers, amounting to hundreds of thousands of individuals' detailed, personal information and thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

69.     The ramifications of Mon Health's failure to keep its patients' PHI secure are long lasting and severe.

70.     Mon Health's delay in identifying and reporting the Data Breach caused additional harm to Plaintiffs and Class Members. Plaintiffs and Class Members were not timely notified of the Data Breach, depriving them of the ability to promptly mitigate potential adverse consequences resulting from the Data Breach.

71.     As a result of a result of Mon Health's failure to prevent the Data Breach, Plaintiffs and Class Members have suffered and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. They have suffered or are at increased risk of suffering:

     a.   Actual identity theft;

     b.   Unauthorized use and misuse of their PHI;

     c.   The loss of the opportunity to control how their PHI is used;

     d.   The diminution in value of their PHI;

     e.   The compromise, publication, and/or theft of their PHI;

     f.   Out-of-pocket costs associated with the prevention, detection, recovery and remediation from identity theft or fraud;

     g.   Lost opportunity costs and lost wages associated with effort expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent

researching how to prevent, detect, contest and recover from identity theft and fraud;

h.  Costs associated with placing freezes on credit reports;

i.  Delay in receipt of tax refund monies;

j.  The diminished value of Mon Health's goods and services they received;

k.  Lost opportunity and benefits of electronically filing of income tax returns;

l.  The imminent and certain impending injury flowing from potential fraud and identity theft posed by their PHI being placed in the hands of criminals;

m.  The continued risk to their PHI, which remains in the possession of Mon Health and is subject to further breaches so long as Mon Health fails to undertake appropriate measures to protect the PHI in its possession; and

n.  Current and future costs in terms of time, effort and money that will be expended to prevent, detect, contest, remediate and repair the impact of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

### H.  Mon Health's Conduct Violates HIPAA

72.    Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§ 1301, *et seq*. These provisions require, among other things, that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling PHI like the data Defendants left unguarded. The HHS has subsequently promulgated five rules under authority of the Administrative Simplification provisions of HIPAA.

73.    Mon Health's Data Breach resulted from a combination of insufficiencies that indicate Mon Health failed to comply with safeguards mandated by HIPAA regulations and industry standards. First, it can be inferred from Mon Health's Data Breach that Mon Health either

failed to implement, or inadequately implemented, information security policies or procedures in place to protect Plaintiffs' and Class Members' PHI

74.    Plaintiffs' and Class Members' Personal and Medical Information is "protected health information" as defined by 45 CFR § 160.103.

75.    45 CFR § 164.402 defines "breach" as "the acquisition, access, use, or disclosure of protected health information in a manner not permitted under subpart E of this part which compromises the security or privacy of the protected health information."

76.    45 CFR § 164.402 defines "unsecured protected health information" as "protected health information that is not rendered unusable, unreadable, or indecipherable to unauthorized persons through the use of a technology or methodology specified by the [HHS] Secretary[.]"

77.    Plaintiffs' and Class Members' Personal and Medical Information is "unsecured protected health information" as defined by 45 CFR § 164.402.

78.    Plaintiffs' and Class Members' unsecured protected health information has been acquired, accessed, used, or disclosed in a manner not permitted under 45 CFR Subpart E as a result of the Data Breach.

79.    Plaintiffs' and Class Members' unsecured protected health information acquired, accessed, used, or disclosed in a manner not permitted under 45 CFR Subpart E as a result of the Data Breach was not rendered unusable, unreadable, or indecipherable to unauthorized persons.

80.    Mon Health reasonably believes Plaintiffs' and Class Members' unsecured protected health information acquired, accessed, used, or disclosed in a manner not permitted under 45 CFR Subpart E as a result of the Data Breach was not rendered unusable, unreadable, or indecipherable to unauthorized persons.

81.     Plaintiffs' and Class Members' unsecured protected health information that was acquired, accessed, used, or disclosed in a manner not permitted under 45 CFR Subpart E as a result of the Data Breach, and which was not rendered unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized persons.

82.     Plaintiffs' and Class Members' unsecured protected health information was viewed by unauthorized persons in a manner not permitted under 45 CFR Subpart E as a result of the Data Breach.

83.     After receiving notice that they were victims of a data breach that required the filing of a Breach Report in accordance with 45 CFR § 164.408(a), it is reasonable for recipients of that notice, including Plaintiffs and Class Members in this case, to believe that future harm (including identity theft) is real and imminent, and to take steps to mitigate that risk of future harm.

84.     In addition, Mon Health's Data Breach could have been prevented if Mon Health implemented HIPAA mandated, industry standard policies and procedures for securely disposing of PHI when it was no longer necessary and/or had honored its obligations to its patients.

85.     Mon Health's security failures also include, but are not limited to:

a.   Failing to maintain an adequate data security system to prevent data loss;

b.   Failing to mitigate the risks of a data breach and loss of data;

c.   Failing to ensure the confidentiality and integrity of electronic protected health information Mon Health creates, receives, maintains, and transmits in violation of 45 CFR 164.306(a)(1);

d.   Failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in

violation of 45 CFR 164.312(a)(1);

e.   Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 CFR 164.308(a)(1);

f.   Failing to identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 CFR 164.308(a)(6)(ii);

g.   Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic protected health information in violation of 45 CFR 164.306(a)(2);

h.   Failing to protect against any reasonably-anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 CFR 164.306(a)(3);

i.   Failing to ensure compliance with HIPAA security standard rules by Defendant's workforce in violation of 45 CFR 164.306(a)(94);

j.   Impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons in violation of 45 CFR 164.502, *et seq.*

86.    The HIPAA Breach Notification Rule, 45 CFR §§ 164.400-414, also required Mon Health to provide notice of the breach to each affected individual "without unreasonable delay and

*in no case later than 60 days following discovery of the breach*."[36]

87.     Because Mon Health has failed to comply with industry standards, while monetary relief may cure some of Plaintiffs' and Class Members' injuries, injunctive relief is necessary to ensure Mon Health's approach to information security is adequate and appropriate. Mon Health still maintains the protected health information and other sensitive information of Plaintiffs and Class Members; and without the supervision of the Court via injunctive relief, Plaintiffs and Class Members' PHI remains at risk of subsequent Data Breaches.

### I.   *Mon Health Failed to Comply with FTC Guidelines*

88.     Mon Health was also prohibited by the Federal Trade Commission Act ("FTC Act") (15 U.S.C. §45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

89.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[37]

---

[36]  Breach Notification Rule, U.S. Dep't of Health & Human Services, *available at*: hhs.gov/hipaa/for-professionals/breach-notification/index.html (emphasis added) (last visited Apr. 5, 2022).

[37]  Federal Trade Commission, *Start With Security: A Guide for Business*, *available at:* https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf   (last accessed Apr. 5, 2022).

90.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses.[38] The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

91.     The FTC further recommends that companies not maintain PHI longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[39]

92.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

93.     Mon Health failed to properly implement basic data security practices. Mon Health's failure to employ reasonable and appropriate measures to protect against unauthorized

---

[38] Federal Trade Commission, *Protecting Personal Information: A Guide for Business*, *available at*:    https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last accessed Apr. 5, 2022).

[39] FTC, *Start With Security*, *supra* note 16.

access to patients' PHI constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

94.      Mon Health was at all times fully aware of its obligation to protect the PHI of patients because of its position as a leading healthcare provider. Mon Health was also aware of the significant repercussions that would result from its failure to do so.

### J.  Plaintiff Rachel Silbaugh's Experience

95.      Plaintiff Silbaugh was required to provide her PII to Mon Health as a condition of receiving medical services.

96.       Plaintiff Silbaugh first heard rumors of Data Breach in or about December 2021 from third party social media accounts.  Plaintiff Silbaugh did not receive any communication from Mon Health regarding the Data Breach until she received Mon Health's Notice of Data Breach in the mail on or about February 28, 2022. The notice stated that Plaintiff Silbaugh's PHI had been improperly accessed by third parties. This PHI included her name, address, date of birth, Social Security number, and other sensitive health information.

97.      As a result of receiving the Notice of Data Breach, Plaintiff Silbaugh spent significant time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Notice of Data Breach and self-monitoring her accounts. This time has been lost forever and cannot be recaptured.

98.      Since the Data Breach, Plaintiff Silbaugh has suffered actual identity theft and fraud.  Plaintiff is very careful with her finances and utilizes a financial advisor to run and monitor her accounts. On March 21, 2022, Plaintiff received an email notification from a company called "Kikoff Credit" notifying her that her "monthly payment account past due." Plaintiff did not have an account with Kikoff Credit, yet she received an invoice for $24.00.

99.     After receiving Defendants' Notice of Data Breach, Plaintiff Silbaugh and her financial advisor checked various sources to determine whether her PHI was located on the dark web. Upon information and belief, Plaintiff's PHI was found in approximately 10 different locations on the dark web.

100.     Additionally, Plaintiff Silbaugh has noticed a significant increase in suspicious phone calls and emails since the Data Breach. Plaintiff receives phone calls approximately once per day, on both her cell and home phone, both of which numbers she provided to Mon Health as a condition of receiving services. Plaintiff also receives what appear to be phishing emails on the email address that she provided to Mon Health as a condition of receiving services.

101.     Plaintiff Silbaugh is very careful about sharing her sensitive PHI. She has never knowingly transmitted unencrypted sensitive PHI over the internet or any other unsecured source.

102.     Plaintiff Silbaugh stores any documents containing her sensitive PHI in a safe and secure location.

103.     Plaintiff Silbaugh suffered actual injury in the form of damages to and diminution in the value of her PHI—a form of intangible property that Plaintiff Silbaugh entrusted Defendant, which was compromised in and as a result of the Data Breach.

104.     Plaintiff Silbaugh suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has increased concerns for the loss of her privacy.

105.     Plaintiff Silbaugh has suffered injury arising from the present and continuing risk of fraud, identity theft, and misuse resulting from her PHI being placed in the hands of

unauthorized third parties and possibly criminals. Plaintiff Silbaugh's PHI has already been misused.

106.    Plaintiff Silbaugh has a continuing interest in ensuring that her PII, which remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

### K.  Plaintiff Robin Stripling's Experience

107.    Plaintiff Robin Stripling was required to provide her PII to Mon Health as a condition of receiving medical services.

108.     Plaintiff Robin Stripling first recieved communication from Mon Health regarding the Data Breach when she received Mon Health's Notice of Data Breach in the mail on or about December 21, 2021. The notice stated that Plaintiff's PHI had been improperly accessed by third parties. This PHI included her name, address, date of birth, and other sensitive health information.

109.    As a result of receiving the Notice of Data Breach, Plaintiff Robin Stripling spent significant time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Notice of Data Breach and self-monitoring her accounts. This time has been lost forever and cannot be recaptured.

110.    Plaintiff Robin Stripling has noticed a significant increase in suspicious phone calls and emails since the Data Breach. Plaintiff Robin Stripling receives phone calls multiple times per day, on her cell which number she provided to Mon Health as a condition of receiving services. Plaintiff Robin Stripling also receives what appear to be phishing emails on the email address that she provided to Mon Health as a condition of receiving services.

111.    Plaintiff Robin Stripling is very careful about sharing her sensitive PHI. She has never knowingly transmitted unencrypted sensitive PHI over the internet or any other unsecured source.

112.    Plaintiff Robin Stripling stores any documents containing her sensitive PHI in a safe and secure location.

113.    Plaintiff Robin Stripling suffered actual injury in the form of damages to and diminution in the value of her PHI—a form of intangible property that Plaintiff Robin Stripling entrusted Defendant, which was compromised in and as a result of the Data Breach.

114.    Plaintiff Robin Stripling suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has increased concerns for the loss of her privacy.

115.    Plaintiff Robin Stripling has suffered injury arising from the present and continuing risk of fraud, identity theft, and misuse resulting from her PHI being placed in the hands of unauthorized third parties and possibly criminals.

116.    Plaintiff Robin Stripling has a continuing interest in ensuring that her PII, which remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

### L.  *Plaintiff Michael Stripling's Experience*

117.    Plaintiff Michael Stripling was required to provide her PII to Mon Health as a condition of receiving medical services.

118.    Plaintiff Michael Stripling first recieved communication from Mon Health regarding the Data Breach when he received Mon Health's Notice of Data Breach in the mail on or about December 21, 2021. The notice stated that Plaintiff's PHI had been improperly accessed

by third parties. This PHI included his name, address, date of birth, and other sensitive health information.

119.    As a result of receiving the Notice of Data Breach, Plaintiff Michael Stripling spent significant time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Notice of Data Breach and self-monitoring his accounts. This time has been lost forever and cannot be recaptured.

120.    Plaintiff Michael Stripling has noticed a significant increase in suspicious phone calls and emails since the Data Breach. Plaintiff Michael Stripling receives phone calls multiple times per day, on his cell phone which number he provided to Mon Health as a condition of receiving services. Plaintiff Michael Stripling also receives what appear to be phishing emails on the email address that he provided to Mon Health as a condition of receiving services.

121.    Plaintiff Michael Stripling is very careful about sharing his sensitive PHI. He has never knowingly transmitted unencrypted sensitive PHI over the internet or any other unsecured source.

122.    Plaintiff Michael Stripling stores any documents containing his sensitive PHI in a safe and secure location.

123.    Plaintiff Michael Stripling suffered actual injury in the form of damages to and diminution in the value of his PHI—a form of intangible property that Plaintiff Michael Stripling entrusted Defendant, which was compromised in and as a result of the Data Breach.

124.    Plaintiff Michael Stripling suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has increased concerns for the loss of his privacy.

125.     Plaintiff Michael Stripling has suffered injury arising from the present and continuing risk of fraud, identity theft, and misuse resulting from his PHI being placed in the hands of unauthorized third parties and possibly criminals.

126.     Plaintiff Michael Stripling has a continuing interest in ensuring that his PII, which remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

## CLASS ACTION ALLEGATIONS

127.     Plaintiffs bring this suit as a class action on behalf of themselves and on behalf of all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

128.     The Class that Plaintiffs seek to represent is defined as follows:

**All individuals whose PHI was compromised in the Mon Health Data Breach which occurred in December 2021.**

129.     Excluded from the Class are the officers, directors, and legal representatives of Mon Health, and the judges and court personnel in this case and any members of their immediate families.

130.     Plaintiffs reserve the right to modify or amend the definition of the proposed Class as additional information becomes available to Plaintiffs.

131.     Numerosity.: The Class Members are so numerous that joinder of all Members is impractical. The Class is comprised of over 492,000 individuals.

132.     Commonality. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a.    Whether and to what extent Defendants had a duty to protect the PHI of Class

Members;

b.  Whether Defendants were negligent in collecting and storing Plaintiffs' and Class Members' PHI;

c.  Whether Defendants had duties not to disclose the PHI of Class Members to unauthorized third parties;

d.  Whether Defendants took reasonable steps and measures to safeguard Plaintiffs' and Class Members' PHI;

e.  Whether Defendants failed to adequately safeguard the PHI of Class Members;

f.  Whether Defendants breached its duties to exercise reasonable care in handling Plaintiffs' and Class Members' PHI by storing that information on networks with inadequate security;

g.  Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

h.  Whether Defendants had respective duties not to use the PHI of Class Members for non-business purposes;

i.  Whether Defendants adequately, promptly, and accurately informed Plaintiffs and Class Members that their PHI had been compromised;

j.  Whether Plaintiffs and Class Members are entitled to actual, damages, statutory damages, and/or punitive damages as a result of Defendants' wrongful conduct;

o.  Whether Plaintiffs and Class Members are entitled to restitution as a result of Defendants' wrongful conduct;

p.  Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach; and

q.  Whether Plaintiffs and Class Members are entitled to identity theft protection for their respective lifetimes.

133.    <u>Typicality</u>. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' PHI, like that of every other Class Member, was disclosed by Mon Health. Plaintiffs' claims are typical of those of the other Class Members because, *inter alia*, all Members of the Class were injured through the common misconduct of Mon Health. Plaintiffs are advancing the same claims and legal theories on behalf of herself and all other Class Members, and there are no defenses that are unique to Plaintiffs. The claims of Plaintiffs and those of Class Members arise from the same operative facts and are based on the same legal theories.

134.    <u>Policies Generally Applicable to the Class</u>. This class action is also appropriate for certification because Mon Health has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members, and making final injunctive relief appropriate with respect to the Class as a whole. Mon Health's policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Mon Health's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

135.    <u>Adequacy of Representation</u>. Plaintiffs will fairly and adequately represent and protect the interests of the Class in that he has no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages he has suffered are typical of other Class Members. Plaintiffs have retained counsel experienced in

complex consumer class action litigation and in particular privacy class litigation, and Plaintiffs intend to prosecute this action vigorously.

136.    <u>Superiority of Class Action</u>. The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of class members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain class members, who could not individually afford to litigate a complex claim against large corporations, like Mon Health. Further, even for those class members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

137.    The nature of this action and the nature of laws available to Plaintiffs and the Class make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and the Class for the wrongs alleged because Mon Health would necessarily gain an unconscionable advantage since Mon Health would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

138.     The litigation of the claims brought herein is manageable. Mon Health's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

139.     Adequate notice can be given to Class Members directly using information maintained in Mon Health's records.

140.     Unless a Class-wide injunction is issued, Mon Health may continue in its failure to properly secure the PHI of Class Members, Mon Health may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Mon Health may continue to act unlawfully as set forth in this Complaint.

141.     Further, Mon Health has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate.

## FIRST CAUSE OF ACTION
### Negligence
### (On Behalf of Plaintiffs and the Class)

142.     Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in the preceding paragraphs.

143.     As a condition of their utilizing the services of Mon Health, individuals were obligated to provide Mon Health with certain PHI, including their dates of birth, Social Security numbers, personal medical information, and other protected health information.

144.     Plaintiffs and the Class Members entrusted their PHI to Mon Health on the premise and with the understanding that Mon Health would safeguard their information, use their PHI for business purposes only, and/or not disclose their PHI to unauthorized third parties.

145.    Mon Health has full knowledge of the sensitivity of PHI and the types of harm that Plaintiffs and Class Members could and would suffer if PHI was wrongfully disclosed.

146.    Mon Health knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of patients' PHI involved an unreasonable risk of harm to Plaintiffs and Class Members, even if the harm occurred through the criminal acts of a third party.

147.    Mon Health had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty includes, among other things, designing, maintaining, and testing Mon Health's security protocols to ensure that Plaintiffs' and Class Members' information in Mon Health's possession was adequately secured and protected, and that employees tasked with maintaining such information were adequately trained on security measures regarding the security of personal and medical information.

148.    Mon Health had a duty to have procedures in place to detect and prevent the improper access and misuse of Plaintiffs' and Class Members' PHI.

149.    Additionally, violations of statutes which establish a duty to take precautions to protect a particular class of persons from a particular injury or type of injury may constitute negligence *per se.*

150.    Section 5 of the FTC Act prohibits ""unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Mon Health, of failing to use reasonable measures to protect PHI. The FTC publications and orders described above also form part of the basis of Mon Health's duty in this regard.

151.    Mon Health violated Section 5 of the FTC Act by failing to use reasonable measures to protect Plaintiffs' and Class Members' PHI and not complying with applicable industry

standards, as described in detail herein. Mon Health's conduct was particularly unreasonable given the nature and amount of PHI they obtained and stored, and the foreseeable consequences of a data breach including, specifically, the damages that would result to Plaintiffs and Class Members.

152.   Mon Health's violation of Section 5 of the FTC Act constitutes negligence *per se.*

153.   Plaintiffs and Class Members are within the class of persons that the FTC Act was intended to protect.

154.   The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and Class Members.

155.   Mon Health's violation of HIPAA also independently constitutes negligence *per se*.

156.   HIPAA privacy laws were enacted with the objective of protecting the confidentiality of patients' healthcare information and set forth the conditions under which such information can be used, and to whom it can be disclosed. HIPAA privacy laws not only apply to healthcare providers and the organizations they work for, but to any entity that may have access to healthcare information about a patient that—if it were to fall into the wrong hands—could present a risk of harm to the patient's finances or reputation.

157.   Plaintiffs and Class Members are within the class of persons that HIPAA privacy laws were intended to protect.

158.   The harm that occurred as a result of the Data Breach is the type of harm HIPAA privacy laws were intended to guard against.

159.   A breach of security, unauthorized access, and resulting injury to Plaintiffs and the

Class Members was reasonably foreseeable, particularly in light of the growing amount of data breaches for health care providers and other industries.

160.    Plaintiffs and Class Members were the foreseeable and probable victims of any inadequate security practices and procedures. Mon Health knew or should have known of the inherent risks in collecting and storing the PHI of Plaintiffs and the Class, the critical importance of providing adequate security of that PHI, and that it had inadequate employee training and education and IT security protocols in place to secure the PHI of Plaintiffs and the Class.

161.    Mon Health's own conduct created a foreseeable risk of harm to Plaintiffs and Class Members. Mon Health's misconduct included, but was not limited to, its failure to take the steps and opportunities to prevent the Data Breach as set forth herein. Mon Health's misconduct also included its decisions not to comply with industry standards for the safekeeping and unauthorized disclosure of the PHI of Plaintiffs and Class Members.

162.    Plaintiffs and the Class Members had no ability to protect their PHI that was in Mon Health's possession.

163.    Mon Health was in a position to protect against the harm suffered by Plaintiffs and Class Members as a result of the Data Breach.

164.    Mon Health had and continues to have a duty to adequately disclose that the PHI of Plaintiffs and Class Members within Mon Health's possession might have been compromised, how it was compromised, and precisely the types of information that were compromised and when. Such notice was necessary to allow Plaintiffs and the Class Members to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PHI by third parties.

165.    Mon Health has admitted that the PHI of Plaintiffs and Class Members was wrongfully disclosed to unauthorized third persons as a result of the Data Breach.

36

166.    Mon Health, through its actions and/or omissions, unlawfully breached Mon Health's duties to Plaintiffs and Class Members by failing to implement industry protocols and exercise reasonable care in protecting and safeguarding the PHI of Plaintiffs and Class Members during the time the PHI was within Mon Health's possession or control.

167.    Mon Health improperly and inadequately safeguarded the PHI of Plaintiffs and Class Members in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

168.    Mon Health failed to heed industry warnings and alerts to provide adequate safeguards to protect individuals' PHI in the face of increased risk of theft.

169.    Mon Health, through its actions and/or omissions, unlawfully breached its duty to Plaintiffs and Class Members by failing to have appropriate procedures in place to detect and prevent dissemination of PHI.

170.    Mon Health, through its actions and/or omissions, unlawfully breached its duty to adequately and timely disclose to Plaintiffs and Class Members the existence and scope of the Data Breach.

171.    But for Mon Health's wrongful and negligent breach of duties owed to Plaintiffs and Class Members, the PHI of Plaintiffsand Class Members would not have been compromised.

172.    There is a close causal connection between Mon Health's failure to implement security measures to protect PHI and the harm suffered or risk of imminent harm suffered by Plaintiffs and the Class. Plaintiffs' and Class Members' PHI was accessed as the proximate result of Mon Health's failure to exercise reasonable care in safeguarding such PHI by adopting, implementing, and maintaining appropriate security measures.

173.    As a direct and proximate result of Mon Health's negligence, Plaintiffs and Class

Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their PHI is used; (iii) the compromise, publication, and/or theft of their PHI; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PHI; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their PHI, which remain in Mon Health's possession and is subject to further unauthorized disclosures so long as Mon Health fails to undertake appropriate and adequate measures to protect the PHI of patients and former patients in its continued possession; (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PHI compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members; and (ix) the diminished value of Mon Health's goods and services Plaintiffs and Class Members received.

### SECOND CAUSE OF ACTION
### Breach of Contract
### (On Behalf of Plaintiffs and the Class)

174.    Plaintiffs re-allege and incorporates by reference herein all of the allegations contained in the preceding paragraphs.

175.    As a healthcare provider, Mon Health entered into contracts with Plaintiffs and Class Members.

176.    The promises and representations described above relating to HIPAA and other industry practices, and about Mon Health's purported concern about its patients' privacy rights became terms of the contract between Mon Health and its patients, including Plaintiffs and Class

Members.

177.    Mon Health breached these promises by failing to comply with HIPAA and other reasonable industry practices.

178.    Plaintiffs and Class Members fully performed their obligations under the contracts with Mon Health. Mon Health breached its agreements with Plaintiffs and Class Members by failing to protect their PHI. Specifically, Mon Health: (1) failed to take reasonable steps to use safe and secure systems to protect PHI; (2) failed to have appropriate security protocols and measures in place; (3) allowed unauthorized third parties to gain access to PHI; and (4) failed to promptly alert or give notice of the Data Breach to Plaintiffs and Class Members.

179.    As a result of Mon Health's breach of these terms, Plaintiffs and Class Members have been harmed and put at risk of future harm.

180.    Plaintiffs and Class Members are therefore entitled to damages, including restitution and unjust enrichment, disgorgement, declaratory and injunctive relief, and attorney fees, costs, and expenses.

### THIRD CAUSE OF ACTION
### Breach of Implied Contract
### (On Behalf of Plaintiffs and the Class)

181.    Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in the preceding paragraphs.

182.    Plaintiffs and Class Members were required to provide their PHI, including names, Social Security numbers, dates of birth, medical histories, and other personal information to Mon Health as a condition of their use of Mon Health's services.

183.    Plaintiffs and Class Members paid money to Mon Health in exchange for goods and services, as well as Mon Health's promises to protect PHI from unauthorized disclosure.

184.    In its written privacy policy, Defendants expressly promised Plaintiffs and Class Members that Defendants would only disclose protected health information and sensitive information under certain circumstances, none of which relate to the Data Breach.

185.    Defendants promised to comply with HIPAA standards and to make sure that Plaintiffs' and Class Members' protected health information would remain protected.

186.    Implicit in the agreement between Plaintiffs and Class Members, to provide PHI, and Mon Health's acceptance of such PHI, was Mon Health's obligation to use the PHI of its patients for business purposes only, take reasonable steps to secure and safeguard that PHI, and not make unauthorized disclosures of the PHI to unauthorized third parties.

187.    Further, implicit in the agreement, Mon Health was obligated to provide Plaintiffs and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their protected health information and other PHI.

188.    Without such implied contracts, Plaintiffs and Class Members would not have provided their PHI to Mon Health.

189.    Mon Health had an implied duty to reasonably safeguard and protect the PHI of Plaintiffs and Class Members from unauthorized disclosure or uses.

190.    Additionally, Mon Health implicitly promised to retain this PHI only under conditions that kept such information secure and confidential.

191.    Plaintiffs and Class Members fully performed their obligations under the implied contract with Mon Health; however, Mon Health did not.

192.    Mon Health breached the implied contracts with Plaintiffs and Class Members by failing to reasonably safeguard and protect Plaintiffs and Class Members' PHI, which was compromised as a result of the Data Breach.

193.    Mon Health further breached the implied contracts with Plaintiffs and Class Members by failing to comply with its promise to abide by HIPAA.

194.    Mon Health further breached the implied contracts with Plaintiffs and Class Members by failing to ensure the confidentiality and integrity of electronic protected health information Mon Health created, received, maintained, and transmitted in violation of 45 CFR 164.306(a)(1).

195.    Mon Health further breached the implied contracts with Plaintiffs and Class Members by failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 CFR 164.312(a)(1).

196.    Mon Health further breached the implied contracts with Plaintiffs and Class Members by failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 CFR 164.308(a)(1).

197.    Mon Health further breached the implied contracts with Plaintiffs and Class Members by failing to identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 CFR 164.308(a)(6)(ii).

198.    Mon Health further breached the implied contracts with Plaintiffs and Class Members by failing to protect against any reasonably anticipated threats or hazards to the security or integrity of electronic protected health information in violation of 45 CFR 164.306(a)(2).

199.    Mon Health further breached the implied contracts with Plaintiffs and Class Members by failing to protect against any reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually

41

identifiable health information in violation of 45 CFR 164.306(a)(3).

200.    Mon Health further breached the implied contracts with Plaintiffs and Class Members by failing to ensure compliance with the HIPAA security standard rules by its workforce violations in violation of 45 CFR 164.306(a)(94).

201.    Mon Health further breached the implied contracts with Plaintiffs and Class Members by impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons in violation of 45 CFR 164.502, *et seq*.

202.    Mon Health further breached the implied contracts with Plaintiffs and Class Members by failing to design, implement, and enforce policies and procedures establishing physical administrative safeguards to reasonably safeguard protected health information, in compliance with 45 CFR 164.530(c).

203.    Mon Health further breached the implied contracts with Plaintiffs and Class Members by otherwise failing to safeguard Plaintiffs' and Class Members' PHI.

204.    Mon Health's failures to meet these promises constitute breaches of the implied contracts.

205.    Because Mon Health allowed unauthorized access to Plaintiffs' and Class Members' PHI and failed to safeguard the PHI, Mon Health breached its contracts with Plaintiffsand Class Members.

206.    A meeting of the minds occurred, as Plaintiffs and Class Members agreed, *inter alia*, to provide accurate and complete PHI and to pay Mon Health in exchange for Mon Health's agreement to, *inter alia*, protect their PHI.

207.    Mon Health breached its contracts by not meeting the minimum level of protection of Plaintiffs' and Class Members' PHI, because Defendants did not prevent against the breach of

over 300,000 patients' PHI.

208.    Furthermore, the failure to meet its confidentiality and privacy obligations resulted in Mon Health providing goods and services to Plaintiffs and Class Members that were of a diminished value.

209.    As a direct and proximate result of Mon Health's breach of its implied contracts with Plaintiffs and Class Members, Plaintiffsand Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their PHI is used; (iii) the compromise, publication, and/or theft of their PHI; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PHI; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their PHI, which remain in Mon Health's possession and is subject to further unauthorized disclosures so long as Mon Health fails to undertake appropriate and adequate measures to protect the PHI of customers/patients and former customers/patients in its continued possession; (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PHI compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members; and (ix) the diminished value of Mon Health's goods and services they received.

**FOURTH CAUSE OF ACTION**
**Breach of Confidence**
**(On Behalf of Plaintiffs and the Class)**

210.    Plaintiffs re-allege and incorporates by reference herein all of the allegations

contained in the preceding paragraphs.

211.    Plaintiffs and Class Members have an interest, both equitable and legal, in the PHI about them that was conveyed to, collected by, and maintained by Mon Health and that was ultimately accessed or compromised in the Data Breach.

212.    As a healthcare provider, Mon Health has a fiduciary relationship to its patients, like Plaintiffs and the Class members.

213.    Because of that special relationship, Mon Health was provided with and stored private and valuable PHI related to Plaintiffs and the Class which it had a duty to maintain such information in confidence.

214.    Plaintiffs and Class Members have a privacy interest in personal medical matters, and Mon Health had a duty not to disclose medical data concerning its patients.

215.     As a result of the parties' relationship, Mon Health had possession and knowledge of confidential PHI and confidential medical records of Plaintiffs and Class Members, information not generally known.

216.    Plaintiffs and Class Members did not consent to nor authorize Mon Health to release or disclose their PHI to unknown criminal actors.

217.    Mon Health breached its duty of confidences owed to Plaintiffs and Class Members. Mon Health breached these duties by, among other things: (a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of PHI; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls,

systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; (g) failing to follow its on privacy policies and practices published to its patients; and (h) making an unauthorized and unjustified disclosure and release of Plaintiffs' and Class members' PHI and medical information to a criminal third party.

218.    But for Mon Health's wrongful breach of its duty of confidences owed to Plaintiffs and Class Members, their privacy, confidences, PHI would not have been compromised.

219.    As a direct and proximate result of Mon Health's breach of its duty, Plaintiffs and Class Members have suffered injuries, including:

    a.    Theft of their PHI;

    b.    Costs associated with the detection and prevention of identity theft and unauthorized use of the financial accounts;

    c.    Costs associated with purchasing credit monitoring and identity theft protection services;

    d.    Lowered credit scores resulting from credit inquiries following fraudulent activities;

    e.    Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Mon Health Data Breach – including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts by the Plaintiffs, the Class and/or their parents or guardians;

f.    The ongoing, imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PHI being placed in the hands of criminals;

g.    Damages to and diminution in value of their PHI entrusted, directly or indirectly, to Mon Health with the mutual understanding that Mon Health would safeguard Plaintiffs' and Class Members' data against theft and not allow access and misuse of their data by others;

h.    Continued risk of exposure to hackers and thieves of their PHI, which remains in Mon Health's possession and is subject to further breaches so long as Mon Health fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' data;

i.    Loss of their privacy and confidentiality in their PHI;

j.    The erosion of the essential and confidential relationship between Mon Health – as a health care services provider – and Plaintiffs and Class members as patients; and

k.    Loss of personal time spent by the Plaintiffs, the Class and/or their parents or guardians carefully reviewing statements from health insurers and providers to check for charges for services not received, as directed to do by Mon Health.

220.    Additionally, Mon Health received payments from or on behalf of Plaintiffs and Class members for services with the understanding that Mon Health would hold in confidences Plaintiffs' and Class members' private medical information.

221.    Mon Health breached the confidences of Plaintiffs and Class members when it made an unauthorized release and disclosure of their confidential medical information and/or PHI.

222.    It would be inequitable for Mon Health to retain the benefit at Plaintiffs' and Class members' expense.

223.    As a direct and proximate result of Mon Health's breach of its duty of confidences, Plaintiffs and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, and/or disgorgement or restitution, in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs on behalf of themselves and all others similarly situated, prays for relief as follows:

a.    For an Order certifying the Class as defined herein, and appointing Plaintiffs and their Counsel to represent the Class;

b.    For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and the Class Members' PHI, and from refusing to issue prompt, complete, and accurate disclosures to Plaintiffs and Class Members;

c.    For equitable relief compelling Defendants to use appropriate cyber security methods and policies with respect to PHI collection, storage, and protection, to disclose with specificity to Class Members the type of PHI compromised and enjoining Defendants' conduct requiring it to implement proper data security practices, specifically:

   i.    prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

   ii.    requiring Defendants to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and laws;

   iii.    requiring Defendants to delete, destroy, and purge the PHI of Plaintiffs and the Class members unless Defendants can provide to the Court reasonable justification

for the retention and use of such information when weighed against the privacy interests of Plaintiffs and the Class members;

iv.    requiring Defendants to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the personal identifying information of Plaintiffs' and the Class members' PII/PHI;

v.    requiring Defendants to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

vi.    requiring Defendants to engage independent third-party security auditors and internal personnel to run automated security monitoring;

vii.    requiring Defendants to audit, test, and train its security personnel regarding any new or modified procedures;

viii.    requiring Defendants to segment data by, among other things, creating firewalls and access controls so that if one area of Defendants' network is compromised, hackers cannot gain access to other portions of Defendants' systems;

ix.    requiring Defendants to conduct regular database scanning and securing checks;

x.    requiring Defendants to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling PHI, as well as protecting the PHI of Plaintiffs and the Class members;

48

xi.    requiring Defendants to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xii.    requiring Defendants to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendants' policies, programs, and systems for protecting PHI;

xiii.    requiring Defendants to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendants' information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xiv.    requiring Defendants to meaningfully educate all Class members about the threats that they face as a result of the loss of their confidential PHI to third parties, as well as the steps affected individuals must take to protect themselves;

xv.    requiring Defendants to implement logging and monitoring programs sufficient to track traffic to and from Defendants' servers;

xvi.    requiring Defendants to design, maintain, and test its computer systems to ensure that PII/PHI in its possession is adequately secured and protected;

xvii.    requiring Defendants to disclose any future data breaches in a timely and accurate manner;

xviii.    requiring Defendants to implement multi-factor authentication requirements;

xix.    requiring Defendants' employees to change their passwords on a timely and regular basis, consistent with best practices; and

49

xx.      requiring Defendants to provide lifetime credit monitoring and identity theft repair services to Class members.

d.      For an award of damages, including actual, nominal, and consequential damages, as allowed by law in an amount to be determined;

e.      For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

f.      For prejudgment interest on all amounts awarded; and

g.      Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully submitted,

Date: April 12, 2022

BY: s/    Mark E. Troy
**MORGAN & MORGAN**
Mark E. Troy, Esq. (WV Bar I.D. No. 6678)
222 Capitol Street, Suite 200A
Charleston, WV 25301
Telephone: (304) 345-1122
Facsimile: (304) 414-5692
mtroy@forthepeople.com

Gary M. Klinger*
*gklinger@milberg.com*
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
227 West Monroe Street, Suite 2100
Chicago, IL 60606
Tel: (866) 252-0878

David Lietz*
*dlietz@milberg.com*
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
5335 Wisconsin Avenue NW
Suite 440
Washington, D.C. 20015-2052

Tel.: (866) 252-0878

**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
Jean S. Martin*
Francesca Kester*
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Telephone: (813) 223-5505
Facsimile: (813) 223-5402
jeanmartin@forthepeople.com

*Attorneys for Plaintiffsand the Proposed Class*

*Pro Hac Vice Forthcoming*